**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:19-cr-00304-LMB** |
| | ) | |
| **HENRY KYLE FRESE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S POSITION ON SENTENCING

It is impossible, still, for Mr. Frese's family, friends and colleagues to understand how he, of all the people in their lives, ended up a criminal defendant awaiting the sentence of this Court. By all accounts, Kyle Frese is a dedicated patriot who worked his whole life in order to one day serve his country in the intelligence community. It was a long road that traversed several countries, included the renouncement of his dual Canadian citizenship, and met with many obstacles along the way. Nevertheless, he kept on the path believing that if he was given the opportunity, he could make a difference.  He worked long hours, volunteered for the most difficult assignments, and was rewarded with increased responsibilities and promotions. Mr. Frese was finally living the professional life he had always wanted and was contributing meaningfully to the defense of his country and its service members.

But his personal life began to suffer.  Following a traumatic break-up with a long-term girlfriend, Mr. Frese slipped into a depressive state. It was during that period that he met and began dating Journalist 1.  The relationship quickly became a priority and Mr. Frese focused a lot of time and energy in to making it work.  At the same time, Journalist 1's career was stalling and she would ask Mr. Frese to share information that she could use to either confirm other information she had received or to give her a lead on potential new stories.  At first those requests were

1

rebuffed, but as the requests mounted and as the relationship deteriorated over time, he eventually relented.

He did so for the purpose of helping her advance her career and with the hope of improving their relationship.  He minimized the significance of what he was doing by rationalizing that he was mostly only confirming information Journalist 1 already had from other sources.  He also wrongly minimized the significance and sensitivity of the information he had disclosed, believing he was being careful not to share top secret material. For the same reasons, and with the same rationalizations, he also agreed to share information with Journalist 2, at Journalist 1's request.

And so it is that Kyle Frese now finds himself a convicted felon in a federal courtroom. His once promising career is over.  His ability to meaningfully contribute to the intelligence community is almost certainly foreclosed. And while he has already suffered substantial repercussions for his conduct, he understands that further punishment awaits him via this Court's sentence.  But the Court should consider that this case is very different from many if not most "leak" cases. And even further removed from the types of cases typically prosecuted under the Espionage Act.

To begin with, there is no allegation of espionage.  This case does not involve a defendant who sought to betray his country by sharing its secrets and deliberately exposing its human assets and programs.  This is not a case where a defendant sought to enrich himself financially by selling information to a foreign bidder or by an attempt to promote his own career.  This case also does not involve a defendant disclosing classified information in an effort to seek revenge against a government that wronged him or to promote any political goal.  Rather, this case presents, at its core, terrible decision-making at a time when Kyle Frese was particularly susceptible to pressure and influence.  For those reasons, and in light of recent sentences imposed in cases that included

more egregious leaks, Mr. Frese's cooperation with investigators, as well as the ongoing COVID-19 pandemic, Mr. Frese, through counsel, asks this Court to sentence him to 12 months and 1 day of incarceration and a term of supervised release.

## I.      THE PLEA AGREEMENT AND SENTENCING GUIDELINES

Mr. Frese pled guilty on February 20, 2020, to Count One of a two-Count indictment returned on October 8, 2019.  Count One charged Mr. Frese with the willful transmission of national defense information in violation of 18 U.S.C. § 793(d).  The maximum punishment for his offense is 10 years imprisonment, a $250,000 find, a $100 special assessment, and three years of supervised release.  Under the terms of the written plea agreement (Dkt. 41), Mr. Frese has agreed to recommend that his base offense level under the United States Sentencing Guidelines ("U.S.S.G." of "Guidelines") should be calculated at a level 35, based on the application of U.S.S.G. § 2M3.2.  *See id*. at ¶4(a).  Moreover, Mr. Frese has agreed that his offense level should be increased by two-levels pursuant to U.S.S.G. § 3B1.3 because he abused a position of trust in committing the offense.

The Presentence Investigation Report's Guidelines calculation is consistent with the parties' recommendation and results in an Adjusted Offense Level of 37.  *See* PSR ¶47.  Following a three-level reduction based on Mr. Frese's acceptance of responsibility, his Total Offense Level is 34, which corresponds to an advisory sentencing range of 151-188 months.  *See id*. at ¶52.  However, because the maximum punishment for a violation of 18 U.S.C. § 793(d) is 120 months, "the statutorily authorized maximum sentence shall be the guideline sentence."  *See* U.S.S.G. § 5G1.1(a).

## II.    THE 18 U.S.C. § 3553(a) SENTENCING FACTORS SUPPORT A NON-CUSTODIAL SENTENCE

Section 3553(a) requires district courts to consider the following factors in imposing sentence:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s).  18 U.S.C. § 3553(a)(1)-(7).  The end result of the analysis must be a sentence that is "sufficient, but not greater than necessary" to comply with four purposes of federal sentencing, i.e., the need for the sentence imposed (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  For the reasons that follow, the requested sentence is "sufficient but not greater than necessary" to serve the purposes of federal sentencing under the circumstances of this case.

### a.  Mr. Frese's Personal History and Characteristics

Kyle Frese was born on October 27, 1988, in Toronto, Canada. He is the third of four children born to his parents who currently reside in Houston, Texas.  He is the only boy and his three sisters are all accomplished young professionals. The family moved frequently when he was young spending time in Italy, Spain, Canada and the U.S.  They are a very close-knit family and, as will be shown, Mr. Frese enjoys tremendous support from both his immediate and extended

family as well as the close friends he has made from every stage of his young life.  *See* Exhibit 1 (providing letters submitted by Mr. Frese's friends and family).[1]

As noted at the outset, Mr. Frese worked very hard to achieve his long-held dream of becoming an intelligence analyst.  As mentioned in many of the attached letters, even from a young age, Mr. Frese always showed a strong interest in history and the military.  It was no surprise then that he ultimately graduated with a BA in History from Queens University, in Ontario.  Following undergrad, Mr. Frese enrolled at the Royal Military College, also in Ontario, where he obtained a MA in Public Administration.

While in school, Mr. Frese bartended and waited tables to help his parents with his tuition and living expenses.[2]  Through connections he made at work and school, he learned about different opportunities that might allow him to break in to the intelligence community.  Through one of those connections, he enrolled in an intelligence analysis class run by former U.S. government analysts.  When he completed the course, the Central Intelligence Agency ("CIA") offered him an analyst position.  It was the break he had been hoping for.  He quickly accepted the offer and began the extensive background check and clearance process.  He passed every test, including polygraph examinations and psychiatric evaluations, and was counting down the days to when he would begin his career at Langley.  That day would never come, however, as a government shutdown caused the CIA to withdraw its offer.

---

[1] The letters have been consolidated into a single attachment and are grouped by immediate family, extended family and friends.

[2] *See* Exhibit 1 (Letter from Anne Frese) ("He worked all through undergrad and grad school as a waiter and bartender, while keeping up his grades and giving back to his community through various fundraising activities.").

Devastated, Mr. Frese returned home to his parents' house. He waited tables at a local restaurant to make a living and kept looking for the next possible opportunity to return to D.C. When he was offered a promotion at the restaurant, he turned it down. He wanted that opportunity to go to another employee who was seeking a career in the industry, knowing he would leave the minute another intelligence offer arose.[3]  Finally, after two very long years, the offer came and he landed a job as a consultant with Booz Allen Hamilton in Virginia.  It was not nearly the opportunity he had with the CIA but it was a start.  It got him back to D.C. and he knew it was a stepping stone to where he wanted to go.

Sure enough, after nearly three years he left Booz Allen to join BAE Systems as a contractor to the Defense Intelligence Agency ("DIA").  Just over a year later, DIA hired Mr. Frese directly as a government civilian employee.  It was in that role, as a counterterrorism analyst at DIA, that Mr. Frese's career began to flourish.  He was given overseas assignments and his leadership approved some projects he had recommended on his own.  More importantly, Mr. Frese could see the impact his work was having on the service members in the field. But it would be short-lived for the reasons that find him before the Court.

While the previous paragraphs describe what Mr. Frese has done, they do not show who he really is.  If there is ever a chance for a sentencing court to learn the true history and characteristics of a defendant awaiting judgement, it typically must come from the words of those who know him best. As the Court can see from the 35 letters that have been submitted on his behalf, there is no shortage of information from which the Court can form a picture of the person it will sentence on June 18.  Indeed, the letters submitted on Mr. Frese's behalf are remarkable,

---

[3] *See* Exhibit 1 (Letter from Henry Frese) ("They offered him a sales job which he turned down because he did not feel that he should take someone else's opportunity when he wasn't committed.").

even to those among us who have read hundreds if not thousands of letters submitted for the same purpose.

First, the letters are uniform in how they describe Mr. Frese as being trustworthy, responsible, honest. In that sense, they demonstrate that his conduct in this case is a complete aberration from the rest of his life. It is clear from the letters that Mr. Frese has been a role model to his friends, cousins and siblings. His sister, Alexis, writes that "[i]n times when I have faced a choice between doing the right thing and taking the easy route, whether I was afraid to tell Kyle became my internal barometer of whether I was making the right decision and acting in accordance with the values by which we were raised." *See id.* (Letter from Alexis Frese). His cousin, Heather, writes that "Kyle has been my motivation to be better both as a person and professionally." *Id.* (Letter from Heather Walpert). Tyler Stratton, one of Mr. Frese's closest friends, affirms to the Court that he continues to hold Mr. Frese "in the highest regards" and notes that Mr. Frese was the only non-Marine groomsman at his wedding. *See id.*

Second, the letters stand out for the way in which they reveal a person who has built many deep and meaningful relationships with a wide group of friends and colleagues. Almost every letter praises Mr. Frese for his generosity, sincerity and kindness. It is also immediately apparent how deeply each of his friends value their friendship and how many of them have relied on Mr. Frese when facing their own difficult situations. For example, Matthew Cunningham-Hill writes to the Court about how "Kyle has been the brother I never had." *Id.* He also tells the Court that when his wedding was cancelled on the eve of the ceremony, it was Mr. Frese who not only "took it up on himself to inform everyone on the guest list" but also "cancelled all his plans for the next several days and stayed with me to help me through this difficult time." Mr. Cunningham-Hill's parents even wrote this Court themselves to describe what a "true friend" Kyle has been to their

son and to offer their experiences with Mr. Frese, who they describe as "honorable," "trustworthy," "reliable," and "intelligent." *Id*.

Third, the letters also provide a convincing and compelling history of an individual who routinely puts the needs of others over his own. According to one friend, Kristen Riley, "He asks about your family, values, history, work, wellbeing, and you feel like the only person in the room. This persona is not superficial; he truly is focused on others, almost to an extreme." *Id*. Ms. Riley's father, an accomplished attorney and former Deputy Chief of the Criminal Division for the Eastern District of Pennsylvania, writes how he "always viewed [Kyle] as the 'guardian' of the group of friends and he took responsibility to make sure all got home without incident….I always found Kyle to be honest, sincere, intelligent and caring toward others." *Id*.

Another friend, Sarah Exler, provides the Court with a truly remarkable example of Mr. Frese's unique selflessness. As she writes, Mr. Frese has helped support her family through the ups and downs of her brother's disease. In particular, she writes about the time her brother's kidneys failed and they needed to locate a donor. In her words, the family did not have any expectations for friends to get tested due to the risk involved with the surgery. "[H]owever, Kyle immediately and selflessly offered to get tested for Scott, and if a match donate his kidney without hesitation." *Id*.

Kara Palmer-Stratton writes how Mr. Frese would check in on her while her husband was deployed overseas and always helps his friends without being asked. As she states, "He has often put people above himself, considered their needs before his own, and gone out of his way to make them happy, sometimes to a fault." *Id*. Another friend, Derek Wigmore, writes that "nearly every single one of my friends who have gone through any type of personal difficulties, can share similar

8

stories of leaning on Kyle to help them get through each challenge they faced. Put simply, he is always there for you no matter what." *Id.*

Lastly, the letters make clear that Mr. Frese is sincere in his expression of remorse for his conduct. It is evident that Mr. Frese has discussed his case with many friends and family and taken responsibility for what he has done and what will follow in the future. His immediate acceptance, as well as his large support network, will ensure that Mr. Frese gets back up on his feet sooner rather than later.

### b.  The Nature and Circumstances of the Offense

The nature and circumstances of Mr. Frese's offense is recounted in the Statement of Facts as well as in the PSR. *See* Dkt. 42; *see also* PSR¶¶6-36. Mr. Frese's own explanation for his conduct is provided in great detail in the results of a forensic psychological evaluation that was completed by Dr. Anita Boss.[4] Moreover, Mr. Frese has written a letter to the Court to share additional information regarding his life and offense.[5] For those reasons, this pleading will not go into great detail regarding topics covered in those submissions. Rather, it is sufficient to say here that Mr. Frese's conduct in this case was not motivated by any desire to harm the United States or its interests. It is true, however, that regardless of his motivation, the unlawful disclosure of classified information does harm to the United States and for that Mr. Frese is embarrassed, ashamed and remorseful.

---

[4] *See* Exhibit 2 (filed Under Seal). Dr. Boss's report has been filed under seal and both the U.S. Probation Office and the U.S. Attorney's Office have been provided copies of the report.

[5] *See* Exhibit 3 (filed Under Seal). Mr. Frese's letter has been filed under seal because it contains personal information and makes reference to his cooperation. Both the U.S. Probation Office and the U.S. Attorney's Office have been provided copies of Mr. Frese's letter.

It is also apparent from Mr. Frese's personal characteristics that he has a long history of going above and beyond to help those around him and has a reputation for putting the needs of others over his own.[6]  That background might help explain the lengths to which he went to make Journalist 1 happy and successful.[7]  And although he alone is responsible for providing this information to Journalist 1, the Court should understand that Journalist 1 received classified information from multiple sources other than Mr. Frese. Indeed, Journalist 1, and later Journalist 2, often asked Mr. Frese to confirm or verify, as a second or third source, information they had already obtained elsewhere.  That is why, as is reflected in the Statement of Facts, Mr. Frese at times accessed information unrelated to his job duties. *See* Dkt. 42 ¶¶14, 19.

At other times, Mr. Frese would access reports related to stories he knew would be published but not for the purpose of sharing what he read with Journalist 1. And while the government may suggest, believe or argue that Mr. Frese was the source for every article that disclosed classified information, he was not.[8]  There were many articles that derived from sources completely separate from Mr. Frese.  Moreover, there were several articles where other sources had clearly provided Journalist 1 more detailed information than Mr. Frese had.  In fact, there were several instances when Mr. Frese pleaded with Journalist 1 not to publish information she had received from other sources because he believed it could compromise U.S. sources.

---

[6] As Mr. Frese's current psychologist noted, "Unfortunately, these same traits that would be admirable in numerous situations, made him vulnerable to violating some of his other deeply held values of integrity and trust, when he agreed to help his ex-girlfriend by disclosing confidential information to her and the other reporter."  *See* Exhibit 4 (filed Under Seal).  Both the U.S. Probation Office and the U.S. Attorney's Office have been provided copies of Ms. McDaniel's letter.

[7] For example, Mr. Frese only agreed to speak to Journalist 2, at Journalist 1's request, if "it helped Journalist 1 'progress.'"  Dkt. 42 ¶15.

[8] It should also be noted that although Mr. Frese shared information with Journalist 1 over an extended period of time, the actual disclosures were sporadic over time.

Mr. Frese, however, was the only source that got arrested.  So, he alone will shoulder all of the blame, and he alone will be accused of all of the harm, even though he should not.  He deserves blame and he caused harm, to be sure.  And he has confronted and accepted that reality.  But the Court should be mindful, when it considers its sentence, that a vast amount of the information that made its way into Journalist 1's and Journalist 2's articles, and from our perspective often the most damaging, did not come from Mr. Frese.

As provided in the Statement of Facts, Mr. Frese also shared information with a third person.  It was the same characteristics that make Mr. Frese a good friend and person, that led Mr. Frese to share a limited amount of classified information with an overseas consultant who had provided critical information to Mr. Frese via Twitter.  In order to show his appreciation and ensure that the source would continue to provide information, Mr. Frese wanted to share something of value in return.  He admittedly made the wrong decision when he passed along classified information that was soon-to-be but had not yet been unclassified.[9]

Mr. Frese's motivations provide context for his offense but do not excuse or mitigate the seriousness of his conduct.  His actions have had real consequences and he is well aware of that.  His motivations, however, do conclusively establish that unlike many other cases involving the transmission of classified information, Mr. Frese never intended to harm the United States and its interests.  Moreover, he was never motivated by any desire to assist a foreign government or further his own political goals.  And while the absence of those motivations does not excuse his crimes, it does militate in favor of a more lenient sentence than that imposed in situations where a defendant sought to harm U.S. interests or help foreign actors.

---

[9] Mr. Frese has provided a more detailed explanation for those events in his letter to the Court.

### c.   The Need to Avoid Unwarranted Disparity Among Similar Offenders

This Court has had recent prior occasion to sentence defendants convicted of leaking information to the press.  In both instances, the Court imposed substantial variances from the excessive Guidelines ranges that attach to § 793(d) convictions.  But the reasons for varying are far stronger in Mr. Frese's case and, for that reason, this Court should vary even further here.

In *United States v. John Kiriakou*, Case No. 1:12cr127, this Court presided over the plea and sentencing of a former CIA officer who leaked classified information to reporters. Specifically, he disclosed the name of an active covert officer who had been associated with an overseas program and linked a separate overt officer to a government program, when the association was still classified.  In addition to leaking classified information, Kiriakou also lied to investigators on multiple occasions when denying his role in disclosing the identities to the reporters.   Additional evidence revealed that Kiriakou had disclosed classified information to journalists about "dozens of CIA officers, including numerous covert officers of the National Clandestine Service…."  *See* Position of the United States with Respect to Sentencing, Dkt. 124 at 6. According to the government, "[a] the time of the disclosures, [ ] defendant was engaged in a concerted campaign to raise his media profile, principally to advance his private pecuniary interests through, among other things, consulting engagement, publication of editorials, more remunerative and secure employment, and sale of his forthcoming book." *Id*. at 2.  After extensive litigation and CIPA hearings, the government and Kiriakou reached an agreement wherein he pled guilty to one count of disclosing the identity of a covert agent and the parties jointly submitted a binding sentencing recommendation to the Court. The Court accepted the parties' agreement and sentenced Kiriakou to *thirty months in prison*.[10]

---

Approximately two years later, this Court presided over the trial and sentencing of Jeffrey Sterling, a former CIA officer accused of leaking the identity of a human asset and classified program to a reporter. *See United States v. Jeffrey Sterling*, Case No. 1:10cr485. In that case, the defendant put the government to its burden and a jury found him guilty on nine counts, seven of which charged Sterling with retaining or sharing classified information.[11] According to the government, Sterling leaked the information for the sole purpose of harming the CIA in retaliation for how he believed he had been treated while serving as a case officer. *See* United States' Memorandum in Aid of Sentencing, Dkt. 464 at 16. At sentencing, the Court calculated the applicable Guidelines as a Level 38, with a corresponding advisory sentencing range of 235 to 293 months. When imposing its sentence, the Court highlighted the fact that unlike Kiriakou, Sterling had not admitted guilt or accepted responsibility. The Court also commented that "there is, in my view, no more critical secret than the secret of those people who are working on behalf of the United States government in covert capacities, even more than the program itself." *See* May 11, 2015 Tr. of Sentencing at Sent. Tr. at 24. Balancing the § 3553(a) factors, the Court imposed a sentence of *42 months in prison*.

Two additional cases provide support for Mr. Frese's sentencing recommendation. The first, *United States v. Jin-Woo Kim*, Case No. 10cr225 (D.D.C), involved the prosecution of a defendant who had provided top secret information regarding North Korea's military capabilities and preparedness to a reporter. When confronted, Kim lied to the FBI by denying that he had been in recent contact with the reporter. After years of litigation, including numerous CIPA hearings, Kim entered into a binding plea agreement that included an agreed sentence of *13 months of*

---

[11] Sterling was also convicted of obstruction of justice and unlawfully conveying government property.

13

*incarceration*.  In support of the agreement, and in particular the significant variance from the

Guidelines range of 151-188 months, the government wrote:

> The parties' sentencing agreement provides a just resolution to this case. Although the recommended sentence is below guidelines and provides the defendant with a lesser term of imprisonment than likely would be imposed after trial and conviction, under the agreement the defendant will be held accountable for his crime not only by admitting his guilt to the lead charge in the indictment, but by standing convicted of a serious federal felony that will preclude him from ever accessing our country's secrets again. The defendant will also be required to serve a term of incarceration that will deter others who are entrusted with our Nation's sensitive national security information and would consider compromising it. Accordingly, the sentence will promote respect for the law and afford adequate deterrence to similar criminal conduct in the future.

> The negotiated sentencing agreement also confers significant benefits on the United States. First, it avoids the expense, time, and risk associated with a jury trial and appeal, as well as additional lengthy pre-trial proceedings under the Classified Information Procedures Act. As this Court is aware, the issues presented by trying a case that has classified information at its core are complex; and their final resolution, whether by this Court or on appeal, is uniquely difficult to predict. *See Kim*, 808 F. Supp. 2d at 55 (observing that there has been a "dearth of prosecutions" under Section 793(d) "most likely" because of the "difficulty in establishing such a violation, combined with the sensitive nature of classified information and the procedures that must be followed in using such information in trial"). An adverse determination concerning the handling of classified information at trial – whether by the trial court or on appeal – can severely hamper, if not end, a Section 793(d) prosecution, as has occurred in other cases involving unauthorized disclosures to the media.

> Most importantly, the United States must balance the need for prosecution with the damage that further disclosure of classified information at trial might cause. Over eight months ago, the prosecution advised the Court and the defense that proving the government's case at trial would require the United States to declassify a substantial amount of TOP SECRET//SCI information. While the United States would have done so had the defendant not agreed to plead guilty, the plea agreement affords the United States a substantial benefit in protecting from disclosure that still-classified information. The undersigned have consulted with the FBI and members of the Intelligence Community affected by the defendant's unauthorized disclosure, and they have concurred in this judgment. Because it appropriately satisfies the need for both punishment and deterrence in light of the nature and seriousness of the offense, the Court should accept the parties' sentencing agreement and sentence the defendant accordingly.

*See* Government's Memorandum in Aid of Sentencing, Dkt. 285 at 10-12.

Lastly, we ask the Court to consider the widely covered prosecution of General David Petraeus. *United States v. David Howell Petraeus*, Case No. 3:15cr47 (W.D.N.C.)  In that case, Petraeus was accused of leaking, to his mistress/biographer, highly sensitive information including "the identities of covert officers, war strategy, intelligence capabilities and mechanisms, diplomatic discussions, quotes and deliberative discussions from high level National Security Council meetings, and [his] discussions with the President of the United States." Statement of Facts, Dkt. 3 at 9.  The FBI interviewed Petraeus more than once at his CIA office, where he was then serving as Director of the CIA.  *Id*. at 12-13.  During those interviews, Petraeus lied to investigators.  *Id*. He later admitted that he had lied and received a two-point enhancement to his Guidelines for obstructing justice. *Id*. at 14.  Petraeus pled to a misdemeanor and the government agreed to ask for no prison time and instead sought a fine of $40,000.

It is notable here that, unlike Kiriakou, Sterling, Kim, and Petraeus, Mr. Frese never once lied to or mislead investigators, even at the time of this arrest.  Accordingly, he was never accused of or charged with false statements or obstruction of justice.  Moreover, unlike Kiriakou, Sterling and Kim, Mr. Frese did not put the government through the burden and expense of years of CIPA hearings and classification decisions and disclosures, only to accept responsibility when it became clear the case was not going to go away and the government was in for the long haul. Unlike Sterling, Mr. Frese did not go to trial.

What is also notable, however, is that none of the defendants who pled guilty benefitted from the filing of a U.S.S.G. § 5K1.1 or FED.R.CRIM.P. 35 motion for their cooperation.  Indeed, Kiriakou, Kim and Petraeus did not even sign plea agreements that required or even mentioned cooperation as part of their obligations.  That factor alone is cause for this Court to grant Mr. Frese

15

a far greater variance than was imposed in those cases in order to avoid unwarranted sentencing disparity.

### d. Purpose of Federal Sentencing

As noted earlier, Congress has identified four purposes of federal sentencing that must guide district courts in selecting a sentence.  The sentence must be "sufficient, but not greater than necessary" to serve those purposes.  We respectfully submit that the purposes of federal sentencing would be fully served by imposition of the sentence recommended in this memorandum.

The first purpose of federal sentencing is "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  In this case, not only has Mr. Frese been convicted of a serious felony, but one that will prohibit him from ever working again in the intelligence or defense community.  He will never be able to serve his country in the same way again, putting an end to a promising and rewarding career.  That fact, coupled with a period of incarceration and supervision reflects the serious nature of his offense and provides just punishment under the full circumstances of his offense and cooperation.

The second purpose of federal sentencing is "to afford adequate deterrence to criminal conduct."  We respectfully submit that a non-incarceration sentence would not frustrate the goal of deterrence.  A strong message of deterrence has already been sent as a result of Mr. Frese's arrest and conviction.  His name and photograph have appeared in numerous publications and a google search turns up page after page of stories from numerous sites across the world including Wikipedia, USA Today, The New York Times, CNBC, Japan Times, The Guardian, The Washington Post, Axios, Edmonton News, etc.  Virtually every form of news media has reported on his case, including government focused sites such as The Hill, Military Times, and Federal

16

News Network.  The widespread publication of this case, regardless of the sentence, has already sent a strong message of deterrence.[12]

The third purpose of federal sentencing is "to protect the public from further crimes of the defendant."  We respectfully submit that neither the public nor the government require further protection from Mr. Frese. To begin with, he will never again have access to classified information. Moreover, his personal history and characteristics, coupled with the manner in which he responded to his arrest and assisted the government's investigation, demonstrate that Mr. Frese is ordinarily a conscientious and law-abiding citizen and will not recidivate.

The fourth purpose of federal sentencing is "to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner."  As noted in the PSR, Mr. Frese does not suffer from any serious or chronic medical conditions or illnesses.  PSR ¶70. He does, however, currently participate in mental health treatment.  It does not appear that Mr. Frese is in need of medical care or correctional treatment.  That being said, this Court should consider the current COVID-19 pandemic and the impact it has had on the Bureau of Prisons when deciding how much incarceration is necessary in this case.

As of June 7, 2020, "[T]he BOP has 134,505 federal inmates in BOP-managed institutions and 12,784 in community-based facilities. The BOP staff complement is approximately 36,000. There are 1999 federal inmates and 184 BOP staff who have confirmed positive test results for COVID-19 nationwide. Currently, 3936 inmates and 452 staff have recovered. There have been

---

[12] *See* Symposium, U.S.S.C., Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, "What Social Science Can Contribute to Sentencing Policy for Economic Crimes," at 22 (Oct. 12, 2000) ("One consistent finding in the deterrent literature is that the certainty rather than the severity of punishment seems to be the most effective deterrent."), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/ research-projects-and-surveys/economic-crimes/20001012-symposium/cPlenaryI.pdf.

78 federal inmate deaths and 1 BOP staff member death attributed to COVID-19 disease." *See* https://www.bop.gov/coronavirus/.  It is well documented that viruses such as COVID-19 are very difficult to control in prison settings due to the confined spaces and the need for interaction between inmates and staff.[13]  As a result, the Attorney General has issued a Memorandum to the BOP encouraging the transfer of inmates to home confinement where appropriate and many states and judicial bodies, facing the same issue in their prison systems, have encouraged judges and prosecutors to consider home confinement and other alternatives to incarceration.[14]

Importantly, this Court should also consider that any time Mr. Frese spends in the custody of the Bureau of Prisons will be served very differently than time served before the COVID-19 pandemic.  Social visits have been suspended.  Inmate internal movement has also been suspended,

---

[13] As several courts have acknowledged, citing experts including the Center for Disease Control and Prevention ("CDC"), "correctional and detention facilities 'present[] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors.'" *United States v. Kennedy*, Case No. 18-20315, Case No. 2020 WL 1493481 at *2 (E.D. Mich. Mar. 27 2020) (quoting CDC, "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities") (Mar. 23, 2020)). "These include: low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of incarcerated/detained persons to exercise effective disease prevention measures (e.g., social distancing and frequent handwashing)." *Id.*

[14] *See Governor Northam Announces Additional Actions to Address COVID-19, Virginia Governor's website* (March 19, 2020) (announcing that he "is encouraging local criminal justice officials, including Commonwealth attorneys, defense attorneys, sheriffs, and other jail officials, to explore proactive measures to combat the spread of COVID-19 while ensuring public safety," which include measures like modifying sentences to reduce jail populations, diverting offenders from being admitted to jail, and using alternatives to incarceration, "*such as home detention with electronic monitoring….*") https://www.governor.virginia.gov/newsroom/all-releases/2020/march /headline-854722-en.html; *see also* Supreme Court of Virginia, April 22, 2020 Third Order Extending Declaration of Judicial Emergency at 4 (ordering lower courts to consider, when imposing or modifying a sentence, "(i) the potential health risks of the COVID-19 public emergency, and (ii) any appropriate alternatives to incarceration").  http://www.vacourts.gov/news /items/covid/2020_0422_scv_order_extending_declaration_of_judicial_emergency.pdf.

with the exception of movement for federal and state hearings and as necessary to manage space in the various facilities.[15]  Without movement, inmates are essentially serving a form of solitary confinement with little interaction with other inmates and virtually no programming opportunities.

### III.     CONCLUSION

For the foregoing reasons and any others that may appear to the Court or that may develop at the sentencing hearing, Mr. Frese respectfully requests that this Court impose a period of incarceration of 12 months and 1 day, and a period of supervised release.

Date:  June 11, 2020                                     Respectfully submitted,

                                                         HENRY KYLE FRESE
                                                         By Counsel,

                                                         /s/
                                                         Stuart A. Sears
                                                         SCHERTLER ONORATO MEAD & SEARS, LLP
                                                         901 New York Avenue, N.W.
                                                         Suite 500
                                                         Washington, DC  20001
                                                         Telephone:     (202) 628-4199
                                                         Facsimile:     (202) 628-4177
                                                         ssears@schertlerlaw.com

---

[15] *See* BOP COVID-19 Modified Operations Plan, https://www.bop.gov/coronavirus/covid19 _status.jsp (last visited June 8, 2020).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of June, 2020, I electronically filed a true copy of the

foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification

of such filing (NEF) to all parties.


/s/_____
Stuart A. Sears
Schertler Onorato Mead & Sears, LLP
901 New York Avenue, N.W.
Suite 500
Washington, DC  20001
Telephone:     (202) 628-4199
Facsimile:     (202) 628-4177
ssears@schertlerlaw.com