**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| v. ) | Case No. 1:19-cr-00304-LMB |
| ) | |
| **HENRY KYLE FRESE,** ) | |
| ) | |
| **Defendant.** ) | |

**DEFENDANT'S RESPONSE TO THE GOVERNMENT'S
POSITION WITH RESPECT TO SENTENCING**

Defendant HENRY KYLE FRESE, by and through counsel, respectfully submits this Response to the Government's Position with Respect to Sentencing. Although Mr. Frese intends to address other portions of the Government's Position at the sentencing hearing, he briefly responds here to address two recent cases cited by the government in support of its requested sentence. *See* Govt. Pos. at 18-20 (referenced the sentences imposed in *United States v. Winner*, Case No. 1:17-cr-34 (S.D. Ga.) and *United States v. Albury*, Case No. 0:18cr67 (D. Minn.)).

In addressing sentencing disparity, the government argues that this Court should give little weight to the sentences it imposed in *Kiriakou* and *Sterling* because the illegal disclosures in those cases happened "over a decade ago" and because "[t]imes have changed…." Govt. Pos. at 17-18.[1] In support, the government notes that social media is more mainstream now than it was during the *Kiriakou* and *Sterling* days, and that Facebook itself did not even exist at the time of the *Sterling* disclosure. *Id*. at 18. Likewise, the government argues that because most mainstream media

---

[1] The sentences themselves were imposed in 2013 (*Kiriakou*) and 2015 (*Sterling*).

1

outlets now print their full content online,[2] "perhaps this collision of online media content and social media is in part to blame for the notable uptick in media leak referrals to the Department of Justice since the *Sterling* and *Kiriakou* prosecutions." *Id*. at 18-19 (providing statistics). Due to those changes, the argument goes, *Winner* and *Albury* serve as "better markers as to sentencing here." *Id*. at 19. The government's arguments do not withstand scrutiny.

First, it is one thing to suggest that media travels farther and faster than it did 15 years ago. We agree. It is another thing entirely to suggest that our foreign adversaries were less capable of accessing published articles prior to the advent of Facebook and Twitter. Such an argument belies reason and fails to acknowledge the lengths to which foreign intelligence agencies go in order to collect information. Foreign actors not only scour the internet incessantly in support of their intelligence gathering efforts but also deploy covert agents to operate inside our country and actively attempt to penetrate our government. To suggest that Mr. Frese deserves a greater sentence than those imposed in *Kiriakou* and *Sterling* because our adversaries could now learn the same information via social media as opposed to print or an online article is unpersuasive.[3]

Second, undersigned counsel has reviewed the pleadings and transcripts from the *Winner* and *Albury* cases and the government does not appear to have made the "social media" argument in either case, even when discussing the sentences imposed in *Kiriakou* and *Sterling*. Not only was it never raised in those cases, but neither Court cited that rationale for imposition of the agreed upon sentence in *Winner* or the contested sentence in *Albury*. Instead, the social media argument

---

[2] The government does not define mainstream media and does not provide any date for when this apparently began.

[3] Indeed, just pages before the government's argument regarding the spread of social media, the government cited a book published in 1998, where a Russian foreign military officer described how much information he learned about national security in U.S. newspapers. *See id*. at 11-12.

appears to have been deployed here in order to convince this Court to separate itself from its previous sentencing decisions in favor of the government's preferred, and substantially harsher, sentence.

Rather than the passage of time or the rise of social media, the more logical and likely reason for the sentences imposed, or agreed to, in *Winner* and *Albury*, is the specific facts of those cases. In *Winner*, the defendant agreed to a binding sentence of 63 months. The agreed upon sentence was substantially longer than other sentences imposed in similar cases where the leak was to the press and not true espionage. But it appears there may have been good reason for the defendant to agree to such a high sentence. For starters, Winner deliberately set out to find a way to gain access to classified information *for the sole purpose of disclosing it to the press and damaging the United States*. Dkt. 320 at 5 (Government's Sentencing Memorandum).[4] Immediately after accepting employment that granted her access to classified information, Winner installed software on her computer to allow her to anonymously disseminate classified information. *Id*. at 6. According to the government:

> In the ensuing months, Winner repeatedly expressed contempt for the United States. On February 25, 2017, Winner wrote that she was "gonnafail" her polygraph examination, which would ask if she had "ever plotted against" the government; claimed that she said she "hate[s] America like 3 times a day"; and when asked "But you don't actually hate America, right?, responded "I mean yeah I do it's literally the worst thing to happen on the planet. On March 7, 2017, Winner expressed delight at an alleged compromise of classified information, and indicated that she was on the "side" of Wikileaks found Julian Assange and alleged NSA leaker Edward Snowden.

*Id*. at 6. (Internal citations omitted).

---

[4] *See id*. ("Soon after her discharge from the Air Force, the defendant researched job opportunities that would provide her renewed access to classified information. She contemporaneously searched for information about anti-secrecy organizations such as Anonymous and Wikileaks.").

Winner's plan came to fruition and she was permitted access to a classified intelligence report classified at the TOP SECRET/SCI level. Just four days after its release, she sent the *actual intelligence report, in its entirety*, to a news outlet. As the government itself noted in *Winner*: "[t]he Intelligence Report described intelligence activities by a foreign government directed at targets within the United States and revealed the sources and methods used to acquire the information contained in the Intelligence Report." *Id*. at 7. This is a significant distinction form Mr. Frese's case because while the Intelligence Reports that Winner intentionally disseminated typically include substantial and specific information about the originator, author, producer, or owner, as well as "information that enables unambiguous and efficient location and retrieval of source,"[5] Mr. Frese's disclosures did not include sources, collection methods, or many specific details. Indeed, as was noted in our Position on Sentencing, "there were several instances when Mr. Frese pleaded with Journalist 1 *not* to publish information she had received from other sources because he believed it could compromise U.S. sources." Dkt. 53 at 10 (emphasis added).

And although all classified information must be protected, it is not all created equal, even when classified at the same level. Revealing sources and collection methods is close, if not equivalent at times, to disclosing the identity of human assets or covert American officers. We expect the government would agree that disclosing an entire intelligence report creates the potential for far more damage to the United States than oral disclosures that do not include sources, collection methods or specific details. Nevertheless, the government seeks four years more of incarceration for Mr. Frese than it did for Winner.

---

[5] *See* Office of the Director of National Intelligence, Intelligence Community Directive 206, Sourcing Requirements for Disseminated Analytic Products, *available at* https://www.dni.gov/files/documents/ICD/ICD%20206.pdf.

The *Albury* case also presents a materially different situation than the instant case. There, the defendant was an FBI agent who, over a period of 18 months, systematically "stole government information from more than 70 documents, of which approximately 50 were classified." Dkt. 35 at 1. Albury had already previously disclosed classified information to a journalist and was in the process of compiling additional documents for disclosure at the time of his arrest. According to the government:

> Defendant was not merely attempting to keep some library of classified information hidden at his home that risked inadvertent disclosure, and he carefully made no claim as to why he had those documents. Rather, defendant moved classified materials that he had taken from the FBI to his personal laptop and manipulated them in to a different format (essentially laundering the information) using a program he downloaded using and anonymous email service. He then reloaded the material onto a micro-SD card that was in an envelope to which was affixed the telephone number of Reporter A – the exact same Reporter to whom he previously disclosed information.

*Id*. at 12.

The documents Albury intended to disclose related to "terrorist threats and recruiting efforts, and the development of human sources" as well as "counterintelligence priorities and information collected pursuant to the Foreign Intelligence Surveillance Act." *Id*. Despite Albury's intent to share 50 documents that contained classified information, the government asks this Court to sentence Mr. Frese to *60 months more* in prison than Albury received when it appears Mr. Frese passed along *less* information than Albury intended to disclose.

Which brings us to the last point on the issue of disparity. While the government is within its right to stress *how many times* Mr. Frese disclosed information, that argument glosses over the equally, if not more, important consideration of the *amount and type of information* that was disclosed. As the Court will recall, *Kiriakou* and *Sterling* involved cases where the defendants disclosed the holy grail of classified information – the identity of a human asset and covert officer.

They also involved the disclosure of an ongoing classified program (*Sterling*) and the connection between an American officer and a previously classified program (*Kiriakou*). This Court has already recognized the significance of those specific types of disclosures. *See* May 11, 2015 Tr. of Sentencing at 24 ("there is, in my view, no more critical secret than the secret of those people who are working on behalf of the United States government in covert capacities, even more than the program itself."). Mr. Frese made no such disclosure and that fact should be reflected in his sentence.[6] And for the reasons argued above, *Winner* and *Albury* do not compel a harsher sentence.[7]

Lastly, with regard to the government's argument that "the collision of online media content and social media is in part to blame for the notable uptick in media leak investigation referrals," it appears equally, if not more plausible, that the increase has more to do with the Department of Justice's new focus on leak investigations at the behest of the Trump administration.[8] The uptick can also be explained in part by the apparent push back from many career government officials dissatisfied with the President's policy decisions.[9] It should come as little surprise given the above, and in light of the well documented loyalty that has come to be

---

[6] As should his immediate confession, cooperation and candor with investigators.

[7] This Court should also consider that unlike Mr. Frese, neither Winner nor Albury benefitted from a U.S.S.G. 5K1.1 motion.

[8] *See* Julia Edwards Ainsley, *Trump Administration Goes on Attack Against Leakers, Journalists*, (August 4, 2017) (reporting that then Attorney General, Jeff Sessions, stated that DOJ had tripled the amount of investigations into leaks of classified information), *available at* https:/www.reuters.com/article/us-usa-trump-sessions-leaks/trump-administration-goes-on-attack-against-leakers-journalists-idUSKBN1AK1UR.

[9] *See* Ken Dilanian, *Under Trump, More Leaks – and More Leak Investigations*, (April 8, 2019) ("Yet there is no doubt, current and former intelligence officials say, that there has been an outpouring of leaks meant to push back against Trump administration policies, including the sorts of disclosures rarely seen before.") *available at* https://www.nbcnews.com/politics/justice-department/under-trump-more-leaks-more-leak-investigations-n992121

expected from agency appointees, that DOJ is receiving far greater leak referrals than in the past. None of which appears attributable to the increased use of social media though it is true leaks are often found and repeated there.

Although that needed to be said in light of the government's argument, it is abundantly clear that the disclosures here did not derive from any intent to hurt the United States or Mr. Frese's dissatisfaction with the President or U.S. policy. Instead, Mr. Frese engaged in his regrettable behavior at a time of clouded judgment and in a misguided effort to salvage a relationship that was not worth saving. For that he will always be sorry. For that he we will always be known. And for that he must also be punished. But he should not be sentenced anywhere even close to the staggering number of years recommended by the government or those sentences imposed in previous cases. A sentence of incarceration for 12 months and 1 day is sufficient, but not greater than necessary, for *this* defendant under *these* circumstances.

Dated: June 17, 2020

Respectfully submitted,

HENRY KYLE FRESE,
By Counsel

/s/ Stuart A. Sears
Stuart A. Sears
VA Bar 71436
SCHERTLER ONORATO MEAD & SEARS, LLP
901 New York Ave., NW
Suite 500 West
Washington, DC 20001
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
ssears@schertlerlaw.com

Attorney for Henry Kyle Frese

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of June 2020, I electronically filed a true copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties.

/s/ Stuart A. Sears
Stuart A. Sears
VA Bar 71436
SCHERTLER ONORATO MEAD & SEARS, LLP
901 New York Ave., NW
Suite 500 West
Washington, DC 20001
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
ssears@schertlerlaw.com